JUDGE MARRERO        10 CV 4540

Jamie M. Brickell
Eric M. Fishman
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
jbrickell@pryorcashman.com
efishman@pryorcashman.com

*Attorneys for Plaintiff Turbon International, Inc.*

RECEIVED
JUN 09 2010
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

TURBON INTERNATIONAL, INC.,

                  Plaintiff,

     -against-

HEWLETT-PACKARD COMPANY,

                  Defendant.

-------------------------------------------------------------------X

Index No. _____

ECF CASE

## COMPLAINT

Plaintiff Turbon International, Inc. ("Plaintiff" or "Turbon"), by its attorneys Pryor Cashman LLP, alleges as follows against defendant Hewlett-Packard Company ("Defendant" or "HP"):

### PARTIES

1.     Plaintiff is a Pennsylvania corporation with its principal place of business at 2704 Cindel Drive, Cinnaminson, New Jersey 08077.

2.     Defendant is a Delaware company with its principal place of business at 3000 Hanover Street, Palo Alto, California 94304.

1

## JURISDICTION AND VENUE

3.    This Court has original jurisdiction over the parties to this action under 28 U.S.C. § 1332 as this action is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4.    Venue is proper in this district under 28 U.S.C. § 1391(a) as HP resides and transacts business in this judicial district.

## FACTUAL ALLEGATIONS

5.    This is an action against HP for fraudulent inducement, misappropriation of trade secrets and unfair competition, arising out of HP's scheme and efforts to deceive Turbon into providing HP complete access to Turbon's most confidential and proprietary trade secret information for the sole purpose of causing irreparable damage to Turbon in its capacity as one of the leaders of the replacement laser printer cartridge industry.

6.    Since the mid-1970s, Turbon has been a leader in the aftermarket imaging supplies business, starting with injection molding and impact ribbons. Turbon's business model since the mid-1990s has been simple:  it manufactures and distributes replacement laser printer cartridges, commonly referred to as "after market" or "remanufactured" cartridges, at prices that are well below the industry standard for brand-name cartridges, commonly referred to as "O.E.M." or original equipment manufacturer cartridges, manufactured by HP and other established name brands. Turbon's products have become viable alternatives to the higher priced O.E.M. laser printer cartridges for many consumers.

7.    Turbon employs a proprietary and sophisticated manufacturing process in order to keep the costs associated with the replacement cartridges low. This manufacturing process is one of the trade secrets – in addition to its distribution and reverse logistics processes – that

2

enables Turbon to make a cost effective product and to offer consumers low prices, thus giving it a competitive advantage over the brand-named printer companies. As a result, Turbon's proprietary processes are highly valued in the industry – it is well known that disclosure of such information would irreparably harm Turbon's market position.

8.     HP is a leader in the laser printer industry. Significantly for these purposes, HP has always maintained, and has emblazoned on its products, that only HP original cartridges should be used with HP printers, suggesting that use of what it has characterized as "after market" cartridges would downgrade the customer's printing results. For example, HP's website states: "Often, remanufactured cartridge print quality degrades, resulting in pages that **are not good enough for distribution** to customers and others outside the company—or even for circulation within the company."[1]

9.     HP persistently treats the laser printer cartridge remanufacturing industry with contempt, and this in turn reduces the overall potential market for Turbon, and the remanufacturing industry as a whole, as a direct competitor.

10.     However, in more recent years HP began to experience growing competitive pressure, especially in the managed print service arena, which is the process whereby companies outsource all printing-related services to an external vendor such as HP. As a result, it began searching for a way to regain and, ideally, to further increase its market share, particularly as many companies, mainly due to high overall printing costs in a very difficult economic environment, began to switch to lower-cost replacement printer cartridges rather than buying expensive O.E.M. printer cartridges such as those offered by HP.

---

[1]  http://www.hp.com/sbso/product/supplies/toner-cartridge-refill.html (emphasis in original).

11.    In order to salvage its position as industry titan, HP had two options: (1) attempt to diminish the remanufacturing industry; or (2) participate in the aftermarket industry and lower its overall costs.

12.    In December 2008, HP led Turbon to believe that it had taken definitive steps to pursue the second such option. Specifically, HP contacted Turbon, advised key Turbon representatives that it had decided to internally utilize low cost replacement cartridges in its managed print services business, and presented Turbon with the opportunity to supply remanufactured cartridges to HP. In exchange, HP required Turbon to give HP complete access to its entire business, including to its highly proprietary manufacturing, distribution, engineering and other processes.

13.    While Turbon had always considered HP to be a competitor, it saw this as a significant positive in two respects. First, after belittling the remanufactured cartridge industry for many years, HP (finally) seemed prepared to acknowledge its legitimacy. Second, HP was offering Turbon the opportunity to supply laser cartridges for the leader in the laser printer industry. This new business would have potentially increased Turbon's yearly revenues and offered good future growth potential. While Turbon would be required to "open its kimono" and grant HP access to all of its proprietary information, any such risk involved would be heavily outweighed by the long-term reward. Turbon also believed that any such risk would be further minimized by a non-disclosure agreement signed by both parties.

14.    Over the next year, in reliance on HP's aforesaid representations, Turbon methodically disclosed every intricate detail of its business to HP, providing HP with access to all of its locations and facilities, as well as all of its technologies, engineering and non-public financial information. During each step in the process, HP advised Turbon that it had become

more and more impressed with Turbon's business, and indeed with the entire industry. What it initially viewed to be a low quality industry, according to key HP representatives, was instead a highly sophisticated, organized and efficient business that had become technically proficient. Indeed, over time, HP realized the true value of low-cost replacement cartridges, particularly in their performance and value.

15.    HP initially seemed to live up to its lofty promises, when, on September 17, 2009, it awarded Turbon the right to supply replacement cartridges for two of its laser cartridge stock keeping units (SKUs) and again, on October 20, 2009, when it awarded Turbon the right to supply replacement cartridges for a third laser cartridge SKU. Turbon did just that, and shipped the first orders of the replacement cartridges to HP in November and December of 2009.

16.    But soon thereafter, HP's actions abruptly changed. In January 2010, HP informed Turbon that it was "shelving" its replacement cartridge program – effectively ending its relationship with Turbon. This was in direct contrast to HP's initial statements, whereby it promised Turbon potentially long-term business. It was at that time that Turbon first suspected HP's true motives – to eliminate the competition.

17.    Upon information and belief, HP's shocking "decision" was no such decision at all. In truth, HP approached Turbon with two specific predisposed paths in view, both of which were motivated purely by greed and self-interest. If, on the one hand, its investigation disclosed that the remanufacturing business was a viable competitor with potentially lucrative opportunities, HP intended to use the information obtained from Turbon to gain an unfair advantage in its effort to compete in that section of the aftermarket. If, however, on the other hand, HP conducted its investigation and concluded that the remanufacturing business was not a viable form of competition to its own cartridges, HP had every intention of using that

information to damage and potentially destroy the remanufacturing industry. In no instance did HP actually plan to carry out its promise of utilizing Turbon as its supplier for gaining entry into the industry.

18.    Upon information and belief, after having painstakingly reviewed the most proprietary and confidential aspects of Turbon's business, HP has now set out to use this information to its advantage. And, in doing so, HP has sought to effectively crush Turbon – a leader in the replacement cartridge industry. With such information, HP now has the ability to alter its own strategies in order to gain a competitive advantage over Turbon and the rest of the remanufacturing industry.

19.    Unsurprisingly, HP is already using the information that it procured from Turbon to harm Turbon and the replacement cartridge industry. Turbon's entire business depends on its ability to present its value proposition in a fair way. From its review of Turbon's business, HP gained a unique understanding of the importance of the availability of empty printer cartridges to Turbon. Historically, HP encouraged its customers to recycle and return O.E.M. laser printer cartridges; however, it had not aggressively enforced that policy. Upon information and belief, based on the inside information it learned from Turbon, HP has recently become much more proactive, using advertising and other marketing tools to more aggressively push its customers to recycle and return all of their O.E.M. laser printer cartridges in hopes of starving Turbon and its competitors of one of their key raw materials.

20.    By way of example, in late-March of 2010, just two months after informing Turbon of its decision to cease doing business with Turbon, HP commenced an unprecedented print-media advertising campaign, including unsubstantiated statistical information denigrating the reliability of replacement cartridges in general when compared with O.E.M. cartridges. As a

result of HP's actions, Turbon faces the prospect of having to compete with its direct competitors in the remanufactured cartridge industry for a much lower inventory of empty cartridges, inevitably precipitating an increase in raw material costs and a corresponding drop in their ability to grow their businesses, to meet market demand, and to compete with HP and other O.E.M. manufacturers on price. Had Turbon known of HP's intention to use the information it learned from Turbon to redirect its marketing to focus on matters more likely to harm Turbon's business, it would have surely declined to give HP unfettered access to its business.

21.    In the end, HP failed to live up to its promises. Rather than granting Turbon lucrative contracts to remanufacture HP replacement cartridges as it had promised, HP instead gained complete knowledge of Turbon's business and most sensitive trade secrets with no intention whatsoever of making whole on its promise. Indeed, HP never in good faith tried to negotiate an agreement with Turbon, or to take its business to Turbon's direct competitors. The only explanation for this conduct is that HP never intended to use the information disclosed by Turbon to negotiate a supply arrangement or other on-going relationship. Turbon was induced to give HP free reign to observe its business by HP's promise of ongoing future business. But now, because of HP's actions, Turbon's business is in peril and any further actions by HP to use or disclose Turbon's confidential trade secret information would be fatal for Turbon and the remanufacturing industry as a whole.

## FIRST CAUSE OF ACTION
### (Fraudulent Inducement)

22.    Plaintiff repeats and realleges the allegations in paragraphs 1-21 of the Complaint.

23.    HP made numerous material representations, both orally and via email, to Turbon to induce it to disclose confidential material.

24.    For example, in December 2008, HP contacted Turbon, advised key Turbon representatives that it had decided to internally utilize low cost replacement cartridges in its managed print services business, and presented Turbon with the opportunity to supply remanufactured cartridges to HP. In addition, on January 15, 2009, HP invited key Turbon representatives to a meeting in Boise, Idaho wherein HP made similar promises and representations.

25.    Those representations made by HP were false at the time they were made, and HP knew they were false when made. HP made such false statements to induce Turbon to give HP complete access to its entire business, including to its highly proprietary manufacturing, distribution, engineering and other processes.

26.    Turbon relied on those material representations to its detriment, disclosing to HP confidential and proprietary trade secret information and materials that, but for such misrepresentations, Turbon would not have disclosed.

27.    HP has caused and will in the future cause Turbon to suffer monetary damages in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

28.    Plaintiff repeats and realleges the allegations in paragraphs 1-27 of the Complaint.

29.    Turbon employs a proprietary, sophisticated and detailed manufacturing process that enables it to (1) manufacture a functionally performing product that meet O.E.M. standards, and (2) charge their customers low prices, thus giving it a competitive advantage over the brand-named printer companies. Turbon's manufacturing process, as well as its distribution and reverse logistics processes, are undeniably trade secrets proprietary to Turbon.

8

30.     Turbon's manufacturing, distribution and reverse logistics processes were revealed to HP in confidence and pursuant to the terms of a non-disclosure agreement.  At all times, this information remained the exclusive property of Turbon.

31.     Turbon has undertaken significant affirmative steps to preserve the secrecy of these processes by requiring employees to protect Turbon's confidential information, and by requiring third-parties dealing on such sensitive matters with Turbon, including HP, to sign non-disclosure agreements protecting the confidentiality of the manufacturing, distribution and reverse logistics processes and other trade secrets.

32.     Upon information and belief, HP has and is continuing to use information collected from Turbon's manufacturing, distribution and reverse logistics processes for its own benefit and to the severe detriment of Turbon.

33.     Such unauthorized exploitation of Turbon's manufacturing, distribution and reverse logistics processes constitutes unlawful misappropriation of trade secrets owned and exclusively controlled by Turbon.

34.     HP's misappropriation of Turbon's manufacturing, distribution and reverse logistics processes has caused and will in the future cause Turbon to suffer monetary damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION
#### (Unfair Competition)

35.     Plaintiff repeats and realleges the allegations in paragraphs 1-34 of the Complaint.

36.     By virtue of its unlawful activities, HP has misappropriated and misused for its own commercial benefit confidential and proprietary business information belonging to Turbon.

37.    As a result, HP has engaged in unfair competition with Turbon and has impaired and will continue to impair, if not completely destroy, the value of Turbon's business.

38.    As a proximate and direct result of HP's unfair competition, Turbon has suffered monetary damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Injunctive Relief)

39.    Plaintiff repeats and realleges the allegations in paragraphs 1-38 of the Complaint.

40.    Turbon has suffered and will in the future suffer irreparable harm unless HP is preliminarily and permanently enjoined from utilizing any of the confidential information provided to it by Turbon under the aforementioned representations and non-disclosure agreements.

41.    Turbon has no adequate remedy at law to protect itself against HP's disclosure and misappropriation of Turbon's confidential trade secrets.

42.    As a result, Turbon is entitled to an injunction enjoining and restraining HP from any further use of its confidential trade secrets.

WHEREFORE, Turbon respectfully requests that (1) it be awarded damages based on HP's fraudulent inducement, misappropriation of trade secrets, and unfair competition, (2) HP be preliminarily and permanently enjoined from using any of the information and materials provided to it by Turbon, (3) it be entitled to a jury trial on all causes of action asserted herein, and (4) it be awarded such other and further relief as this Court deems appropriate.

Dated: New York, New York
       June 9, 2010

PRYOR CASHMAN LLP

By: _____
       Jamie M. Brickell
       Eric M. Fishman
7 Times Square
New York, New York  10036
(212) 421-4100
jbrickell@pryorcashman.com
efishman@pryorcashman.com

*Attorneys for Plaintiff Turbon International, Inc.*